# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

ELLEN WALTMAN,

        Plaintiff,

   v.

UNITED SERVICES, INC.,

        Defendant.

Civil Action No. 3:20-cv-1676 (CSH)

**OCTOBER 6, 2022**

## RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**HAIGHT, Senior District Judge:**

Plaintiff Ellen Waltman, formerly a crisis response clinician at Defendant United Services, Inc., brought this action against her former employer. Plaintiff alleges that Defendant's termination of her employment was in retaliation for her invocation of rights under the Family and Medical Leave Act ("FMLA") and constituted interference with her exercise of rights under the same statute. Defendant denies any liability.

Following discovery, Defendant moves for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. Plaintiff resists that motion. This Ruling resolves the motion.

## I. FACTUAL BACKGROUND

The pleadings, parties' Local Rule 56(a) statements, discovery, and material subject to judicial notice reveal the following facts that are undisputed or indisputable.

### A. Plaintiff's Employment at United Services

United Services is a not-for-profit organization providing mental health and social services to individuals and families in northeastern Connecticut. Def.'s Local Rule 56(a)(1) Statement of Undisputed Material Facts ("Def.'s Rule 56(a)") (Doc. 20) ¶ 1. United Services hired Plaintiff in September 2016 as a full-time crisis clinician. *Id.* ¶ 2. As a crisis clinician, Plaintiff met with potential clients in crisis (*e.g.*, with homicidal or suicidal ideations), evaluated whether they were eligible for mental health care from United Services, and referred them for mental health services either internally or at outside providers. *Id.* ¶¶ 4–5, 22–23. Crisis clinicians at United Services are not permitted to provide ongoing counseling after a referral is made or to otherwise continue to assist potential clients, and must log all crisis response communications in a system called Profiler. *Id.* ¶¶ 22–24.

Plaintiff regularly handled the sensitive and confidential records of patients, including information about patients' mental health and substance abuse, in the course of her work. *Id.* ¶ 6. As a healthcare provider, United Services must comply with the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub. L. 104-191, which prohibits disclosure of an individual's protected health information without a signed authorization from that individual permitting disclosure to designated providers or other individuals. *Id.* ¶ 7. Violating HIPAA is a federal crime and violations by United Services' employees could jeopardize its funding and ability to operate. *Id.* United Services has implemented written policies to ensure that it and its staff comply with HIPAA and other privacy laws.[1] *Id.* ¶ 8.

Specifically, when an employee wishes to release protected health information to a third party, the employee must (1) obtain a signed release, (2) draft a letter to the third party on United

---

[1] These policies are summarized *infra* at Section III. They incorporate HIPAA and other laws and regulations concerning the privacy of patient records. *See* Def.'s Exh. C (Doc. 20-3) at 2, 4.

Services letterhead, and (3) submit the proposed letter and release to the medical records compliance staff. *Id.* The medical records compliance staff then verifies that the release is valid and stamps the correspondence with a message in red ink saying that it may not be forwarded or copied. *Id.* ¶ 19. A copy of the stamped correspondence is retained in the client's medical record. *Id.* If the information is sent out via email, the stamped letter containing such information must be included as an attachment, along with the signed release, and the email must be encrypted. *Id.* Protected health information cannot be sent in the body of an email. *Id.*

Plaintiff signed an acknowledgment agreeing to comply with these policies and accepting that a violation of the policies constituted a crime and grounds for termination. *Id.* ¶¶ 9, 12–14. United Services provided Plaintiff with specific training on HIPAA and the confidentiality of medical and substance-abuse records. *Id.* ¶ 17. Plaintiff had also been trained on HIPAA compliance in previous jobs during her approximately twenty years as a clinician. *Id.* ¶ 16. In addition to these requirements, United Services required Plaintiff, as a crisis clinician, to receive approval from a supervisor before being absent from the workplace. *Id.* ¶ 28.

### B. Plaintiff's Performance at United Services

On June 21, 2017, less than one year after Plaintiff began working at United Services, she was placed on an "improvement plan" to remedy perceived issues with her attitudes toward and communications with co-workers and supervisors. *Id.* ¶ 41. Plaintiff was taken off the improvement plan after three months. *Id.*

On July 10, 2018, Plaintiff received her annual evaluation. Pl.'s Exh. B (Doc. 26-5) at 6. While the evaluation stated that Plaintiff met or exceeded all requirements, it also noted some areas in which Plaintiff was continuing to work on previous issues:

> There have been times when Ellen feels others may be undermining her clinical judgment, and this may not be the case. Ellen and I have developed an approach

3

to identify when she feels this way and what she could do to manage herself in a healthier way. Ellen will come to me and discuss the situation before it causes her to become very upset. She will review how she feels with her team over the phone or in person to assure there are no breakdowns in communication. . . . Ellen has worked on being able to accept constructive feedback and has improved in this area over the year.

*Id.* at 1.

On two unspecified occasions in September and October 2018, one of Plaintiff's coworkers, Jayme Boling, told Plaintiff's program manager and division director, Sara Barber, that she was concerned about Plaintiff's behavior. Def.'s Exh. A (Doc. 20-1) ¶ 25; Def.'s Exh. J (Doc. 20-10) at 2. They attempted to address these issues directly with Plaintiff. Def.'s Exh. A ¶ 25.

On October 4, 2018, Plaintiff received an off-cycle "reassessment." Def.'s Exh. I (Doc. 20-9), at 2. In this review, Barber noted that serious issues had arisen with Plaintiff's behavior, similar to those that gave rise to the June 2017 improvement plan. *Id.* at 2–3.

Ellen's attitude and presentation to others in team meeting[s] is often negative as well as the language and way that she chooses to write and send emails to staff, including upper management. Ellen has been on an improvement plan (6/21/17–9/21/17) for this in the past and [therefore] an immediate corrective plan will be put in place.
. . .
Ellen struggles to accept feedback and take direction when she feels strongly about something or a situation that she is part of. Ellen has been directed multiple times not to send emails when she is in disagreement with a decision made by the DD and to follow up directly by phone or in person, but has continued to send emails often times questions or calling others out when she feels a situation should have been handled differently.
. . .
Ellen shows poor judgment in her ability to interact with others in a professional way, including her past manager and other agency staff. Ellen often understands that she should not be sending emails with certain language and when asked about this will apologize[;] however, this seems to continue to occur.

*Id.* Barber rated Plaintiff as unsatisfactory in the categories of attitude and team work, ability to take direction, and judgment. *Id.*

4

Barber placed Plaintiff on a correction plan, a schedule of goals for employees perform-ing "far below expectations." *Id.* at 4. (An improvement plan, in contrast, is for employees whose performance is merely "below expectations." *Id.*) The correction plan states the following goals for Plaintiff:

> Ellen will improve her presentation with staff as well as the manner in which she frames her emails to others. Ellen will follow up directly (by phone or in person) with her immediate supervisor when she has a concern about the content of a communication.
> Ellen will appropriately voice her concerns in a more appropriate way—rather than via emails. She will take directives as they are given and will seek immediate clarification if needed.
> Ellen will immediately stop sending out emails that are not appropriate and will interact with others in a professional manner.

*Id.* at 4–5. On October 4, 2018, Plaintiff signed an acknowledgment stating that she had re-viewed the correction plan with her supervisor. *Id.* at 6.

### C. Plaintiff Takes Leave from Work on October 25, 2018

On the morning of October 25, 2018, Plaintiff reported to work. Def.'s Rule 56(a) at ¶ 29. Her personal cell phone was not working, so she left work shortly after arriving to take her phone to a Verizon store to be repaired. *Id.* At the time Plaintiff left, her supervisor, Lisa Odgren, had not yet arrived. Pl.'s Local Rule 56(a)(2) Statement of Undisputed Material Facts ("Pl.'s Rule 56(a)") (Doc. 26-2) ¶ 29. Plaintiff notified her colleagues, but not Odgren, that she was go-ing to the Verizon store, even though Plaintiff did have Odgren's cell phone number and could have contacted her to ask permission. Def.'s Resp. to Pl.'s Statement of Disputed Facts (Doc. 28-1) ¶ 10 (citing Waltman Dep. (ECF No. 20-2) at 43:17–44:14).

Plaintiff returned to work and told Odgren that she was feeling unwell and would need to leave for the rest of the day. Def.'s Rule 56(a) ¶ 30. Odgren allowed Plaintiff to leave early but told her that she would need to document the absence as vacation time, not sick time. *Id.* ¶ 31.

Plaintiff recorded her absence as sick time. *Id.* ¶ 32. On October 31, Odgren emailed Plaintiff to say that she could not approve Plaintiff's timesheet unless Plaintiff submitted a vacation request. *Id.* ¶ 33. Plaintiff responded, writing, "I was sick Lisa and my stomach was not okay before I got to work. I am taking sick time." *Id.* Minutes later, Plaintiff sent a second email to Odgren, saying, "Lisa, I have lupus and I woke up that morning with a headache from the medication I am taking. I came in anyway but the stress of my phone made it worse. I rarely take any sick time, but my stomach was upset and the headache was worse and that is when I asked to leave and use sick time. I don't think you want to push me on this."[2] Def.'s Rule 56(a) ¶ 34.

Two days later, on November 2, Odgren issued a two-page written warning to Plaintiff stating that she had violated the attendance policy and behaved unprofessionally on the day of October 25 and in her emails of October 31. *Id.* ¶ 36. The letter stated:

> Your behavior on October 25th was unprofessional, lacked good judgment, and b[o]rders on insubordination. You are currently on a correction plan which was reviewed and signed by you on October 4[,] 2018, indicating multiple areas that are in need of immediate correction. These areas include:
>
> - Attitude and Team Work
> - Ability to Take Direction
> - Judgment
>
> Your corrective plan specifically states that you have been directed multiple times not to send out emails to others when you disagree with a decision made by a supervisor and that you struggle to accept feedback when you disagree with a decision. In situations like this, you have been directed to call or follow up directly. You have also been asked to present your emails more professionally. You have consistently shown poor judgment in your ability to interact professionally with others as your unacceptable behavior continues to take place.
>
> Your unprofessional behavior surrounding the events on October 25th and October 31st and your lack of insight into your ongoing actions is of great concern. You continue to exhibit the same behaviors despite a plan of correction being in place and these areas of concern being brought to your attention by multiple supervisors. Your failure to take direction along with the above-noted concerns will

---

[2] Defendant asserts that this is the first time Plaintiff told Odgren that she has lupus. *Id.* ¶ 35. Plaintiff disagrees, claiming that she told Odgren she had lupus on October 25, 2018 when she said she wanted to leave work early. Pl.'s Rule 56(a) ¶ 35.

not be tolerated and will be subject to further disciplinary action up to and includ-
ing termination.

Def.'s Exh. F (Doc. 20-6) at 2. The letter is dated Friday, November 2. *Id.* Plaintiff's signature at

the bottom, acknowledging receipt, is dated Monday, November 5. *Id.*

### D. Plaintiff Receives FMLA Leave

Also on November 2, Plaintiff submitted a request for intermittent FMLA leave due to

her lupus. Def.'s Rule 56(a) ¶ 37.[3] The request was signed by Plaintiff's dermatologist, who ex-

plained that lupus is a "chronic autoimmune condition" and that Plaintiff "can work full time but

may need to take sick days if her disease flares[.]" Defs.' Exh. H (Doc. 20-8) at 3. The dermatol-

ogist indicated that Plaintiff might intermittently need "2–3 days off at a time." *Id.* at 5.

United Services granted Plaintiff's request for FMLA leave on Monday, November 5.

Def.'s Rule 56(a) ¶ 38.

### E. United Services Receives Written Complaints

That same day—November 5—United Services received an unsigned two-page letter

claiming to be a compilation of complaints by Plaintiff's coworkers regarding her behavior.

Def.'s 56(a) ¶ 43. The letter stated:

> [Plaintiff's] recent behaviors have been alarming and should be brought to your
> attention. . . . Her choices, opinions, and actions are starting to interfere with her
> work and those she interacts with . . . .
>     It is well known within the department that Ellen prides herself as the one to
> make her own judgement calls about safety, completely disregarding policy and
> procedure. She does not only put herself in danger, but puts the already vulnerable
> population she works with, in harm[']s way. This is said because of the last client
> she sent to the ED in October. Her peers repeatedly attempted to assist her to walk
> the client to the Windham Hospital ED. However, Ellen decided to walk the client
> over by herself, without staff accompaniment. . . . This is not the first time Ellen
> has decided to ignore protocol and jeopardize the safety of all involved. Ellen has

---

[3] The faxed request has a time stamp of 1:45 pm. Defs.' Exh. H (Doc. 20-8) at 2. It is unclear whether the
request was sent to United Services before or after Odgren issued the warning letter.

been known to say, "I've been doing this job for over 30 years, I know what I'm doing", and disregards the recommendations of others, and again, safety protocol.

When it comes to taking advice from co-workers, Ellen fails. . . . Ellen is constantly defensive when someone brings something to her attention, regardless of the topic. . . .

Without miss, in group settings, Ellen is not open to commentary or "round table" discussion. She will make rude comments to anyone looking her way about the other people that are part of the group. . . . She rolls her eyes, makes faces, and snorts to make it known she is annoyed or displeased by the person talking. This is not only rude and unprofessional, it puts her "audience" in an awkward position feeling as though they have to agree with her. . . .

It is also well known in the department that Ellen expects a daily phone call form her husband. Often times during these calls, Ellen engages in an argument with him. . . .

Ellen also makes her opinions very well known in her multiple emails to various people within the company. Even if the email is deemed a private matter between her and management, she is very vocal about it. She will often forward these emails to her peers in [an] effort to ridicule the responses of the other person. . . . She proudly shared her email about "pregnancy is not an illness" after ruminating over a co-worker's approved time off. She will often make negative remarks about her peers using their earned benefit hours.

The day Ellen had an issue with her personal cell phone is a day heard throughout the agency. She began her day in a frenzy that her personal cell phone was not working correctly. She went as far as to involve the company's I.T. department. She became frantic . . . Because of this, Ellen . . . decided to leave early to take of this and because her husband wasn't answering her multiple calls, leaving the crisis department with minimal coverage. When asked if she could stay one more hour until coverage arrived, Ellen in tears, stated she was too upset to stay and work, and left early, against recommendation.

Ellen is one who constantly questions authority. Not only does she question these individuals, she makes extremely inappropriate comments about them. . . . Regardless of the feedback she receives, Ellen is always on the defensive, and engages in cursing and name calling. She often uses curses and derogatory name calling when referring to [her supervisors and coworkers]. . . .

A person who exhibits all of the above behaviors is someone who, not only does NOT belong working with psychologically and emotionally compromised clientele, she may be in need of psychological evaluation herself. Her attitude is poor, her judgement is clouded, she has rapidly changing mood swings, and engages in risky behavior. The environment this woman is causing within the departments is unacceptable, and frankly, frightening. It is unfair for her co-workers to be subjected to these behaviors and the environment it creates. Ellen Waltman's presentation is that of an unstable and unwell individual, unfit of her title as a clinician.

Def.'s Ex. J (Doc. 20-10), at 4–5.

At 8:50 am the next day, November 6, one of Plaintiff's coworkers, Jayme Boling, emailed a written complaint against Plaintiff to Odgren and Barber, their supervisor and division director, respectively. *Id.* at 2. The email is titled "Formal Concern" and is approximately one page in length. *Id.* at 2–3. Boling wrote:

> I am writing to express my formal grievance regarding the constant conflict with my co-worker Ellen Waltman.
>
> On two occasions, I have verbally and unofficially expressed my concern to Sara Barber, the Division Director, who informed me of the process to make a formal complaint. Sara in no way coerced, influenced, directed, or encouraged me to make this complaint. . . .
>
> . . . On a few occasions, I have pointed out safety procedures to Ellen, which she has failed to follow. I told her I was concerned for her safety. Although safety concerns are an on-going topic within the [Crisis Response Services] team, I no longer approach this subject with her, for fear that I will be yelled at again. I know other CRS team members have had similar conversations, and experienced the same hostility.[4]
>
> Ellen consistently points out our age difference. If I ask a question about a client that she has worked with, and [she] does not like the question, she becomes angry. She consistently yells at me for questioning her. She sent me an email stating, she has "been doing this longer than I have been alive." She also notes that she is old enough to be my mother. This type of conversation occurs every few months.
>
> . . . Ellen has made comments to my co-workers about, how I feel I am high and mighty now that I have earned my [license in clinical social work]. I feel Ellen harbors resentment toward me . . . .
>
> . . .
>
> The hostility, which I feel Ellen has toward me, is not fair to the entire team or the agency. . . . I have not spoken to Ellen since Friday. I enjoy coming to work. I enjoy my job. I do not enjoy talking to Ellen on many occasions, because I do not know how she is going to react. I have remained hopeful that the two of us would be able to work this situation out. At this time, I am unsure of what the core issue is.
>
> I have greatly struggled with making this formal complaint. I know Ellen has personal struggles, just as we all do. I also know according to the NASW code of ethics, I am to address an issue with my co-worker first, and if the problem cannot be resolved I am to discuss the situation with my supervisor. Due to the constant aggression and hostility toward me, I no longer feel I can manage this situation on my own. I would appreciate your assistance in resolving this matter for the betterment of the team, agency, and myself.

---

[4] Plaintiff denies that she ever responded with hostility or condescension to Boling, and further asserts that Boling "was a difficult employee to deal with." Pl.'s Rule 56(a) ¶ 45.

*Id.* Barber forwarded this email to United Services President and CEO Diane Manning at 1:17 pm that day with the comment, "FYI[.]" *Id.*

### F. United Services Investigates Plaintiff

After receiving the two written complaints, Manning began an investigation into Plaintiff's conduct. Def.'s Exh. A ¶ 26. Manning reviewed Plaintiff's emails in search of evidence that would either substantiate or refute the complaints against her. Def.'s Rule 56(a) ¶ 47. In the course of this review, on or about November 8, Manning saw an email in Plaintiff's records with the subject line "concerns." Def.'s Exh. A ¶ 28; Def.'s Exh. M (Doc. 20-13), at 3. Manning stated, in a sworn affidavit, that based on the subject line, she thought this email might involve the interpersonal issues raised by the two complaints. Def.'s Exh. M, at 3.

When Manning opened the email, she realized that it did not pertain to issues with coworkers. Def.'s Exh. A ¶ 29. Rather, it was an email Plaintiff sent on September 12, 2018 to a Connecticut government official in an attempt to find housing and mental health care for a former client, "A.J." Def.'s Rule 56(a) ¶ 48; Def.'s Exh. M at 3. The email contained A.J.'s protected health information—including references to his past substance use, "significant mental [h]ealth issues[,]" criminal record, and interactions with Plaintiff (such as how he initially told her, "I hate white people"). Def.'s Rule 56(a) ¶ 48; Def.'s Exh. M at 3. In violation of United Services' policies, the email was not encrypted and no signed release by A.J. was attached. Def.'s Exh. A ¶¶ 31, 33. To Manning, this was "an immediate red flag that prompted [her] to investigate further." *Id.* ¶ 33.

Manning searched Plaintiff's email for other communications relating to A.J. *Id.* ¶ 35. She found two additional emails containing A.J.'s protected health information: one sent on July 30, 2018, and a second sent on September 27, 2018. Def.'s Exh. M. at 2, 4. Both were sent to an

individual at an organization called Family Reentry and are similar in content to the September 12, 2018 email. *Id.* In the July 30 email, Plaintiff states that A.J. is "currently residing in a Sex Offender placement[,]" "has stopped using drugs[,]" and does not wish to remain in his current city as "this is where his criminal career started." *Id.* at 2. In the September 27 email, Plaintiff states that A.J. has "MH [mental health] issues and SA [substance abuse]" and was receiving treatment in his former placement. *Id.* at 4. In both emails, Plaintiff requests the recipient's help in having A.J. placed in a different group home. *Id.* at 2, 4. Plaintiff did not attach a signed authorization to release A.J.'s information to either email. Def.'s Rule 56(a) ¶¶ 57, 62.

During her investigation, Manning searched United Services' Profiler system for records relating to A.J. Def.'s Exh. A ¶ 35. She found only one signed release of protected health information from A.J., dated February 2018 and authorizing disclosure only to A.J.'s parole officer. *Id.* ¶ 39. She found no notes of communications regarding A.J. after June 27, 2018, even though the emails had been sent in July and September 2018—and crisis response clinicians are required to log communications in Profiler and are not permitted to provide ongoing assistance to individuals after making a referral. *Id.* ¶ 38; Def.'s Rule 56(a) ¶¶ 23–24, 60.

On November 8, 2018, United Services placed Plaintiff on paid administrative leave while it continued to investigate whether her emails constituted a violation of federal and state law and company policies. Def.'s Rule 56(a) ¶ 49. United Services provided Plaintiff with a letter stating that the investigation "regard[ed] violation of agency policy No. 702, Confidentiality, and agency policy No. 702.3, Confidentiality of Substance Abuse Records." *Id.* ¶ 50. The letter did not mention the incident involving Plaintiff taking leave on October 25, 2018. *Id.* ¶ 51.

During its investigation, United Services concluded that Plaintiff violated United Services policies Nos. 702 and 702.3, according to a subsequent letter to Plaintiff dated November

16. Def.'s Exh. L (Doc. 20-12) at 3. United Services asserted that, in addition to sending the three emails discussed above, Plaintiff emailed an official at the State of Connecticut Department of Mental Health and Addiction Services. *Id.* at 2. In the body of the email, she identified A.J. by name, reported that he had been a sex offender and had a history of drug use, and sought help in finding a residential facility for him. *Id.* United Services also stated that Plaintiff recorded, in the Profiler system, making calls or sending faxes to several people—including A.J.'s parole officer, a legislator's office, and members of A.J.'s treatment team at another organization—about securing housing and disability benefits for A.J. *Id.* United Services informed Plaintiff, by letter, that her actions constituted "a clear violation of professional boundaries and put this individual and our agency at risk[,] as [she] never had an ongoing clinical relationship with this individual and there were no signed release of information (ROI) forms on file giving [her] permission to divulge any of the protected health information[.]" *Id.* at 2–3.

### G. United Services Terminates Plaintiff's Employment

In her November 16 letter to Plaintiff, having laid out the conduct described above and the governing law, regulations, and policies, Manning continued:

> Violations of this magnitude rise above the agency's progressive discipline policy and are considered egregious in nature and represent a level [of] misconduct that will not be tolerated at United Services.
> Because you violated policies and procedures by divulging protected health information and because you misrepresented yourself as a treating clinician when in fact [A.J.] was not in active treatment with you or any service provider at United Services, *your employment with United Services is terminated effective today, Friday November 16, 2018.*

*Id.* at 3 (emphasis added).

United Services contends that A.J. was never Plaintiff's client at United Services, and moreover, was not eligible to be a client of United Services from July to September of 2018 because he moved outside of the area United Services serves. Def.'s Rule 56(a) ¶¶ 72–73. Plaintiff

disputes this, asserting that A.J. *was* Plaintiff's client and citing in support the following passage

in Plaintiff's deposition:

> Q      This individual was never your client, he was not open in Profiler as a cli-
>        ent receiving treatment from you or any other clinician at United Services
>        . . . . Do you deny any of those things?
> A      He was a crisis client of mine, and I continued to help him.
> Q      He was not a client of United Services, right?
> A      He was a client of the crisis team.
> Q      He was not open in Profiler as a client of United Services, was he?
> A      I don't believe so, no.

Def.'s Exh. B, Doc. 20-2, at 93–94. In response to United Services' statement that A.J. was inel-

igible to be a client of United Services from July to September of 2018 because he had moved

outside of its service area, Plaintiff denies the conclusion without offering any explanation for

why A.J. was not open in Profiler as a client or how, if he lived outside the service area, A.J. was

eligible to be a client. Pl.'s Rule 56(a) ¶¶ 72–73 ("Response: Denied. He was a client of the

plaintiff at United Services.").

United Services states that because the only signed release of information on file for A.J.

was regarding his parole officer, and dated February 15, 2018, Plaintiff's emails violated her ob-

ligations regarding A.J.'s protected health information. Plaintiff denies this allegation with the

following statement, repeated no fewer than ten times in Plaintiff's Rule 56(a):

> Plaintiff did not violate [D]efendant's privacy policies. Plaintiff did not violate
> HIPAA. Plaintiff had verbal authorization from the client to release substance
> abuse information. Plaintiff also had a letter from the client giving authorization
> to release information. Plaintiff believed that she was not in violation of HIPAA
> because of the verbal authorization and the letter.

*See* Pl.'s Rule 56(a) ¶¶ 53, 58, 59, 63, 64, 68, 69, 75, 76, 79. Plaintiff, in deposition, stated that

A.J. had given her verbal permission to disclose his protected health information and that she

believed, but did not confirm, that there was also written authorization from A.J. in his file.

Def.'s Exh. B, Doc 20-2, at 76–80 ("He gave a verbal authorization and there is a written one

somewhere."). The written authorization Plaintiff refers to is a handwritten note from A.J. that was, in fact, dated January 29, 2019, several months after Plaintiff sent the three emails discussed above and several months after her termination. Def.'s Rule 56(a) ¶ 78; Def.'s Exh. B, Doc 20-2, at 91–92. A.J. provided this note to Plaintiff's attorney. Def.'s Exh. B, Doc 20-2, at 91–92.

In her emails, Plaintiff refers to A.J. facing mental health issues and difficulty accessing appropriate care, but does not indicate an acute medical emergency, imminent safety threat, crime, or other exception to the signed authorization requirement. Def.'s Exh. M, Doc. 20-13.[5] Plaintiff had the ability to contact her supervisor, Odgren, and Odgren's supervisor, Barber, although it is disputed whether Odgren was always available when Plaintiff was dealing with an imminent-risk client. Def.'s Resp. to Pl.'s Statement of Disputed Facts, Doc. 28-1, ¶ 3.

After her termination, Plaintiff applied for unemployment benefits with the Connecticut Department of Labor. Her application was rejected, and her appeal was rejected, for the stated reason that she was terminated for willful misconduct.[6]

---

[5] Plaintiff disputes this, stating that "the email refers to significant mental health issues and not receiving appropriate care." Pl.'s Rule 56(a) ¶ 77.

[6] While Defendant makes note of this fact, unemployment benefits decisions by the DOL have no preclusive effect in subsequent litigation arising under the FMLA. *McAllister v. Price Rite*, No. 3:09-CV-01888 VLB, 2013 WL 5187036, at *6 (D. Conn. Sept. 13, 2013) ("Connecticut's General Statutes specifically enumerate that findings reached during unemployment proceedings have no preclusive effect on 'any other action or proceeding' except those proceeding under Connecticut's unemployment compensation statutes. Conn. Gen. Stat. § 31–249g(b)."); *see also Pollard v. New York Methodist Hosp.*, 861 F.3d 374, 381 (2d Cir. 2017) (holding that an employer is not estopped from challenging a New York state unemployment benefits decision because New York labor law "provides that unemployment insurance decisions do not have preclusive effect in subsequent litigation"). Moreover, the DOL Appeal Decision addresses only whether Plaintiff's employment was terminated for willful misconduct, without addressing the precise legal questions at issue here, of retaliation—including whether the termination was pretextual—and interference with Plaintiff's exercise of rights under the FMLA. As such, the agency's findings are not dispositive of the issues in this civil action.

### H. Plaintiff's Proposed Comparators

A crisis response clinician named Corina Jane worked on Plaintiff's team from March 2017 until November 2017. Def.'s Rule 56(a) ¶¶ 84, 86. Jane had requested and received FMLA leave in August 2015 and on other subsequent locations. *Id.* ¶ 85. In November 2017, Jane was promoted to the position of case manager coordinator. *Id.* ¶ 86. Jane resigned from United Services in January 2019. *Id.* ¶ 88.

Plaintiff did not identify any United Services employees who violated HIPAA, did not request FMLA leave, and were not terminated. *Id.* ¶ 89. To the contrary, United Services has terminated the employment of employees who have violated HIPAA and had never requested FMLA leave. *Id.* ¶ 91. United Services has granted requests for continuous and intermittent FMLA leave for several employees, including Jane, without terminating their employment. *Id.* ¶ 90.

Defendant now moves for summary judgment dismissing, in its entirety, Plaintiff's federal action. Def.'s Mem. 1.

### II. STANDARD FOR SUMMARY JUDGMENT

Defendant's motion is made under Rule 56(a) of the Federal Rules of Civil Procedure, which provides: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

This standard "provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphases in original).

"As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

A district judge adjudicating a motion for summary judgment must perform "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that can properly be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," a circumstance that is not presented "if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson*, 477 U.S. at 250.

When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the nonmoving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (citation and quotation marks omitted).

The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250 (citing *Dombrowski v. Eastland*, 387 U.S. 82, 87 (1967); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).

A court must view any inferences drawn from the facts in the light most favorable to the party opposing the summary judgment motion. *See Dufort v. City of N.Y.*, 874 F.3d 338, 347 (2d Cir. 2017) ("On a motion for summary judgment, the court must 'resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is

sought.'"). A court will not draw an inference of a genuine dispute of material fact from conclusory allegations or denials. *See Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).

In sum, the ultimate test "is whether the evidence can reasonably support a verdict in plaintiff's favor." *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 157 (2d Cir. 2000). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Baez v. JetBlue Airways Corp.*, 793 F.3d 269, 274 (2d Cir. 2015) (quoting *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) ).

With respect to employment discrimination claims, "[t]he Second Circuit has cautioned district courts that they must be 'particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question. Because direct evidence of an employer's discriminatory intent will rarely be found, 'affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'"" *Miller v. Edward Jones & Co.*, 355 F. Supp. 2d 629, 636 (D. Conn. 2005) (quoting *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997)). However, "[s]ummary judgment is appropriate even in discrimination cases," *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000), because "a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Schwapp*, 118 F.3d at 110.

### III. DISCUSSION

In its motion for summary judgment, United Services moves for dismissal of Plaintiff's complaint in its entirety. United Services thus requests summary judgment on Plaintiff's claims of retaliation and interference under the FMLA, 29 U.S.C. § 2601, *et seq*. Plaintiff opposes United Services' motion and asserts that, at minimum, there exist genuine issues of material fact as to whether United Services violated the FMLA.

**A. Retaliation Claim**

The FMLA provides employees with distinct rights to take leave under certain medical circumstances. *Hale v. Mann*, 219 F.3d 61, 68 (2d Cir. 2000) (quoting 29 U.S.C. § 2612(a)(1)(D)). Furthermore, the FMLA "protects an employee from discharge or demotion by an employer if that action is motivated by the employee's taking of leave pursuant to the FMLA." *Hale*, 219 F.3d at 68 (citing 29 U.S.C. § 2614(a)(1)). The Second Circuit recognizes two types of FMLA claim: retaliation and interference. *See Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004) (per curiam). To plead an FMLA retaliation claim, one must establish that "1) he exercised rights protected under the FMLA; 2) he was qualified for his position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Potenza*, 365 F.3d at 168. *See also Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 147 (2d Cir. 2012) (applying FMLA retaliation elements set forth in *Potenza*).

In such retaliation cases, the Second Circuit employs the *McDonnell Douglas* burden-shifting analysis.[7] *Potenza*, 365 F.3d at 168 ("In the context of [plaintiff]'s claim, the retaliation analysis pursuant to *McDonnell Douglas* is applicable."). *See also Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 429 (2d Cir. 2016) ("We will analyze the retaliation claims brought pursuant to the FMLA under the burden-shifting test set forth in *McDonnell Douglas* . . . .").

Under the *McDonnell Douglas* framework, if the plaintiff successfully meets the initial burden of alleging the elements of retaliation, the burden shifts back to the employer to state a legitimate non-discriminatory reason for its action. *See Graziadio*, 817 F.3d at 429. Then, if the defendant is able to provide such a reason, the burden returns to the plaintiff to prove that the defendant's articulated reason for its action is "pretextual," that is, that its only real reason for

---

[7] *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973).

discharging the plaintiff was retaliation for plaintiff's exercise of rights protected under the FMLA. *See id. See also, e.g.*, *Stevens v. Coach U.S.A.*, 386 F. Supp. 2d 55, 61 (D. Conn. 2005); *Kuo v. Computer Assocs. Int'l, Inc.*, No. 05-CV-3295 (DRH) (JO), 2007 WL 2874845, at *5 (E.D.N.Y. Sept. 27, 2007).

Plaintiff established the first element of her FMLA retaliation claim because she exercised her rights to leave under the FMLA. Although the Parties did not expressly address whether Plaintiff was qualified for her position, other than to cite to Plaintiff's performance reviews, I assume for purposes of this Ruling that she was. Plaintiff has also established the third element of her FMLA retaliation claim because she was terminated from her employment on November 16, 2018. Def.'s Exh. L (Doc. 20-12) at 3. However, Plaintiff's claim of FMLA retaliation cannot survive summary judgment unless she can also show, under the McDonnell Douglas burden-shifting framework, that "the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Potenza*, 365 F.3d at 168. The parties dispute whether Plaintiff does so.

### 1. Prima Facie Retaliation Case

To prove the fourth element of her prima facie case of retaliation, Plaintiff points solely to the temporal proximity between her application for intermittent FMLA leave on November 2 and the termination of her employment on November 16, following an investigation launched on November 8. Doc. 26-1 at 7–8. Plaintiff argues that this closeness in time, between protection action and termination, suffices to give rise to an inference of retaliatory intent. *Id.*

Temporal proximity can, but does not necessarily, establish a prima facie case of retaliation. *See Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988) ("Proof of the causal connection can be established indirectly by showing that the pro-

tected activity was closely followed in time by the adverse action."); *Davis v. State Univ. of N.Y.*, 802 F.2d 638, 642 (2d Cir. 1986) (affirming a finding of a prima facie case of retaliation on the basis that "the protected activity was closely followed by adverse actions"). The Second Circuit "has declined to draw a bright line as to how close in time the events must be[,]" *Brandon v. Kinter*, 938 F.3d 21, 40 (2d Cir. 2019), but has held that a period of three weeks between a protected action and termination "is sufficiently short to make a prima facie showing of causation indirectly through temporal proximity." *Zann Kwan v. Andalex Group, LLC*, 737 F.3d 834, 845 (2d Cir. 2013).

United Services disputes whether temporal proximity is enough, in this case, to prove that Plaintiff's termination "occurred under circumstances giving rise to an inference of retaliatory intent." *Potenza*, 365 F.3d at 168. *See* Doc. 19 at 11–13. To establish an inference of retaliatory intent, a party must show that a "causal connection exists between the plaintiff's protected activity and the adverse action taken by the employer." *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 152 (2d Cir. 2012). Defendant contends that Plaintiff has failed to point to any evidence, beyond temporal proximity, to show that such a causal connection exists.

United Services primarily relies on *Hewett v. Triple Point Tech., Inc.*, 171 F. Supp. 3d 10, 20 (D. Conn. 2016), in which this Court granted summary judgment to a defendant facing an FMLA retaliation claim where the plaintiff "failed to uncover any evidence of retaliatory animus beyond the temporal proximity of her termination." *Id. Hewett* concerned a plaintiff who was fired on September 20, 2013 after having taken sick or vacation days because of her asthma in January, February, March, June, July, and September 2012, as well as in May, August, and September 2013. *Id.* at 14. Hewett, however, never requested FMLA leave or requested medical leave for a period of three or more days, which would have triggered her FMLA rights, leading

the Court to conclude that "it is unclear that Hewett actually exercised any of her FMLA rights[.]" *Id.* at 14, 20. Hewett also conceded that a "negative performance review she received on August 2, 2013 was *not* motivated by FMLA retaliatory animus, significantly narrowing the window in which such animus could have developed" before her termination the following month. *Id.* at 20.

The timing and surrounding context in the instant case are distinguishable. Here, Plaintiff submitted a request for intermittent FMLA leave, clearly invoking her rights under the FMLA. Six days later, she was placed on leave facing an investigation into her conduct. Two weeks after her request for intermittent FMLA leave, she was fired. These circumstances may not prove Plaintiff's case in full, but her burden "to survive summary judgment at the *prima facie* stage is de minimis[,]" *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87 (2d Cir. 2001) (alteration, quotation marks, and citation omitted), and a reasonable trier of fact could conclude that these circumstances give rise to an inference of retaliatory intent.

### 2. Legitimate, Non-Discriminatory Reason

Turning to the second step of the *McDonnell Douglas* burden-shifting framework, United Services puts forward what it claims are legitimate, non-discriminatory reasons for terminating Ms. Waltman: her violations of HIPAA and related company policies.[8]

Plaintiff does not contest that she sent emails containing A.J.'s protected health information on four occasions: twice to Connecticut government officials, and twice to an individual at Family Reentry. Def.'s Exh. A ¶¶ 31, Def.'s Exh. M at 2–4, Def.'s Exh. L at 2. These emails

---

[8] The record also reflects concerns about Plaintiff's interactions with her colleagues and supervisors, as expressed in her colleagues' complaints, Exh. J at 2–5, and two negative performance reviews she received, Def.'s Exh. I; Def.'s Rule 56(a) ¶ 41. Because discussion of these concerns is not necessary to decide whether Defendant had a legitimate, non-discriminatory reason to terminate Plaintiff's employment, and Defendant rests its argument in that regard on Plaintiff's HIPAA violations, I will not discuss them at this stage of the analysis.

identified A.J. by name and described his status as a sex offender and his history of mental illness and substance abuse. Def.'s Exh. A ¶¶ 31, Def.'s Exh. M at 2–4, Def.'s Exh. L at 2. None of these emails was encrypted, none included a signed release, and none included A.J.'s information as an attachment, rather than in the text of the email. Def.'s Exh. A ¶¶ 31, Def.'s Exh. M at 2–4, Def.'s Exh. L at 2. A.J.'s computer file contained only one signed release form, dated February 2018 and authorizing disclosure only to A.J.'s parole officer. Def.'s Exh. A  ¶ 39. Finally, at least three of these emails were sent in July and September 2018, but A.J.'s computer file contained no notes of communications regarding A.J. after June 27, 2018. Id. ¶ 38.

Plaintiff denies many of the statements in Defendant's Rule 56(a) statement containing these facts. See Pl.'s Rule 56(a) ¶¶ 53, 58, 59, 63, 64, 68, 69, 75, 76, 79. But her dispute is with the implications of those facts, not their underlying substance. As many courts have noted, "'arguing over the possible implications stemming from an otherwise undisputed fact does not render that fact in dispute.'" *Yetman v. Cap. Dist. Transp. Auth.*, No. 1:12-CV-1670 GTS/CFH, 2015 WL 4508362, at *10 (N.D.N.Y. July 23, 2015), *aff'd*, 669 F. App'x 594 (2d Cir. 2016) (quoting *Blakes v. Ill. Bell Tel. Co.*, 11–CV–0336, 2015 WL 135028, at *1 (N.D. Ill. Jan. 9, 2015)). Plaintiff merely disputes whether the underlying facts constitute a violation of HIPAA or Defendant's privacy policies, in light of her factual assertion that she received a verbal authorization to release information (whether this asserted authorization was given in each instance or was a blanket authorization is not clear) and maintained a subjective belief that she was not in violation of HIPAA. *See, e.g.*, Pl.'s Rule 56(a)9 ¶ 53. Therefore, "to the extent Plaintiff responds to [Defendant's] properly supported factual assertions solely by denying 'implications' contained therein, the Court deems the factual assertions admitted." *Yetman*, 2015 WL 4508362, at *10.

Here, United Services' properly supported factual assertions show that Plaintiff's actions violated both United Services policies and, potentially, federal law.

United Services' agency policy No. 702 states, "The confidentiality rights of clients are to be maintained at all times." Def.'s Exh. C (Doc. 20-3), at 2. The policy continues:

> 1. Any person requesting Protected Health Information (PHI) will be told that the information is not available unless a written Release of Information is on file.
>
> 2. A referring doctor or agency may be told if the individual has become a client of United Services. An attempt will be made to obtain a Release of Information from the client/guardian to communicate with the primary care physician or agency to coordinate care. No additional information will be given without a written Release of Information.
>
> 3. Confidentiality of Protected Health Information is maintained in accordance with Connecticut Statutes Section 17a-28 (Formerly Sec. 17-431) and U.S. Code. 42 USC 290dd-3 and 42 USC 290ee-3 for federal laws, and 42 CFR Part 2 for federal regulations and [HIPAA].
>
> 4. No oral communication should be initiated without having the written authorization for release of information in United Services' possession.
>
> . . .
>
> 7. Members of the workforce are expected to keep confidential everything they have read, heard, or seen concerning all clients at United Services strictly confidential [sic].
>
> 8. Emergency situations, as detailed in statutes, will be exempt from this policy.

*Id.* The policy refers to 42 U.S.C. §§ 290dd-3 (which currently concerns "Grants for reducing overdose deaths") and 290ee-3 (which currently concerns "State demonstration grants for comprehensive opioid abuse response"). It is not clear when the policy was drafted, but language that was formerly included at §§ 290dd-3 and 290ee-3 is now codified at 42 U.S.C. § 290dd-2, which concerns "Confidentiality of records[.]" Section 29s0dd-2 provides:

> Records of the identity, diagnosis, prognosis, or treatment of any patient which are maintained in connection with the performance of any program activity relat-

> ing to substance abuse . . . treatment, rehabilitation, or research, which is conduct-
> ed, regulated, or directly or indirectly assisted by any department or agency of the
> United States shall, except as provided in subsection (e) of this section, be confi-
> dential and be disclosed only for the purposes and under the circumstances ex-
> pressly authorized under subsection (b) of this section.

42 U.S.C. § 290dd-2(a). Disclosure is permitted either "with the prior written consent of the pa-

tient" under subsection (b) or in the following situations: "[t]o medical personnel to the extent

necessary to meet a bona fide medical emergency[;]" in anonymized form, "[t]o qualified per-

sonnel for the purpose of conducting scientific research, management audits, financial audits, or

program evaluation[;]" by court order; within the Uniformed Services and components of the

Department of Veterans Affairs; or to report "suspected child abuse and neglect to the appropri-

ate State or local authorities." 42 U.S.C. § 290dd-2(b), (e).

Agency policy No. 702.3 similarly states, "The confidentiality of alcohol and drug abuse

patient records is protected by Federal law and regulations, including [HIPAA,]" and provides

that employees

> may not disclose to a person outside the agency that an individual attends the pro-
> gram, or disclose any information identifying a patient as an alcohol or drug abus-
> er unless:
>
> 1. The patient consents in writing; OR
>
> 2. The disclosure is allowed by a court order; OR
>
> 3. The disclosure is made to medical personnel in a medical emergency or
> to qualified personnel for research audit, or program evaluation; OR
>
> 4. The patients commits or threatens to commit a crime either at the pro-
> gram or against any person who works for the program.
>
> Violation of the Federal law and regulations by a program is a crime. Suspected
> violations may be reported to the United States Attorney in the district where the
> violation occurs.

*Id.* at 4.

HIPAA, similarly, requires providers to receive written authorization before disclosing protected health information unless they "in good faith, believe[] the use or disclosure: (i)(A) Is necessary to prevent or lessen a serious and imminent threat to the health or safety of a person or the public; and (B) Is to a person or persons reasonably able to prevent or lessen the threat, including the target of the threat[.]" 45 C.F.R. § 164.512(j)(1)(i).

It is beyond reasonable dispute that Plaintiff failed "to keep confidential everything [she] ha[d] read, heard, or seen concerning all clients at United Services[,]" in violation of agency policy No. 702. The record contains no indication of a prior written authorization supporting the release of A.J.'s protected health information to anyone other than his probation officer, or of any medical or other emergency supporting disclosure under United Services' policies or 42 U.S.C. § 290dd-2(b). This is despite Plaintiff's contention that as a general manner, A.J. faced "significant mental health issues and [was] not receiving appropriate care[,]" Pl.'s Rule 56(a) ¶ 77, neither of which constitutes an emergency, which entails some element of suddenness, or unexpectedness.[9] Plaintiff also gave substantial indication in the emails that A.J.'s condition was *improving*, not deteriorating. Doc. 20-13 at 2–4 (A.J. "has stopped using drugs[,]" "has shown a great deal of progress[,]" and "is acting responsibly . . . and has come a long way"). As such, United Services had good reason to conclude that the exceptions for emergencies and imminent threats did not apply, and that Plaintiff had therefore violated both its policies and the laws governing the proper treatment of protected health information. Plaintiff's approximately twenty years of professional

---

[9] Merriam-Webster defines "emergency" as "an *unforeseen* combination of circumstances or the resulting state that calls for immediate action" and, in the medical context, as "a *sudden* bodily alteration such as is likely to require immediate medical attention[.]" *Emergency*, MERRIAM-WEBSTER'S UNABRIDGED DICTIONARY (emphasis added). The elements of unforeseeability or suddenness are lacking in the instant case, however serious A.J.'s needs may have been. *See also Emergency*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("1. A sudden and serious event or an unforeseen change in circumstances that calls for immediate action to avert, control, or remedy harm. 2. An urgent need for relief or help.") and *Emergency*, OXFORD ENGLISH DICTIONARY ("4.a(a) (The ordinary modern use.) A juncture that arises or 'turns up'; *esp.* a state of things unexpectedly arising, and urgently demanding immediate action.").

clinical experience, and training in this and previous roles on HIPAA compliance, would tend to undermine any argument she might raise that her actions reflected even a good-faith interpretation of HIPAA.

United Services provided Plaintiff with specific training on HIPAA and the confidentiality of medical and substance-abuse records. *Id.* ¶ 17. Plaintiff had also been trained on HIPAA compliance in previous jobs during her approximately twenty years as a clinician. *Id.* ¶ 16.

This Court has reached the same result in cases involving similar conduct by an employee. In 2017, for instance, Judge Meyer found that an employer "easily met its obligation to identify a non-discriminatory reason for terminating plaintiff's employment" where "defendant asserts that plaintiff was terminated for violating HIPAA and hospital policy by improperly accessing [the patient chart of a relative of one of plaintiff's supervisors] without a business reason for doing so." *Grewcock v. Yale New Haven Health Servs. Corp.*, 293 F. Supp. 3d 272 (D. Conn. 2017). Similarly, in 2015, the Eastern District of New York found that an employer had a legitimate, non-discriminatory reason to terminate a prison medical staff coordinator who sent unencrypted emails to her personal email address containing reports of prisoners' medical needs. *Forrester v. Prison Health Servs.*, No. 12 CV 363 (NGG)(LB), 2015 WL 1469521, at *10, *22 (E.D.N.Y. Jan. 5 2015), *adopted in part and modified in part*, No. 12-cv-363 (NGG)(LB), 20215 WL 1469737, at *28 (E.D.N.Y. Mar. 30, 2015) (granting defendant's motion for summary judgment on FMLA retaliation claim).

Finally, a distinction is worth drawing between the facts in this case and those in *Foley v. Town of Marlborough*, another FMLA retaliation suit recently decided by this Court. *Foley v. Town of Marlborough*, No. 3:19-CV-01481 (VAB), 2022 WL 3716505, at *29 (D. Conn. Aug. 29, 2022). In *Foley*, the employer claimed to have terminated the plaintiff because "he continued

to use FMLA leave when it had been exhausted[.]" *Id.* at *28. The Court denied the employer's motion for summary judgment, finding genuine issues of material fact as to whether the plaintiff had actually done so. *Id.* at *29 ("[W]hether Mr. Foley exhausted his leave is an issue for the jury, and whether Defendants believed Mr. Foley had exhausted his leave, had informed him of the exhaustion, and attempted to work with him on finding a resolution that would be beneficial to him . . . are also issues for the jury."). Here, the record leaves no room to dispute the key questions: Ms. Waltman sent the emails in question, United Services discovered the emails, and the emails were in violation of its policies and applicable law.

### 3. Pretext

With Defendant having demonstrated a legitimate, non-discriminatory reason for terminating Plaintiff's employment, the burden now falls on Plaintiff to show that Defendant's stated reason was pretextual. *See Graziadio*, 817 F.3d at 429. In other words, she must "establish, through either direct or circumstantial evidence, that the employer's action was, in fact, motivated by discriminatory retaliation." *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013) (internal quotation marks omitted).

Plaintiff argues, as she did at the prima facie stage, that the closeness in time between her request for intermittent FMLA leave and her termination establishes that the stated reason was merely pretextual. Doc. 26-1 at 8 ("In other words, [D]efendant argues that the fourteen (14) days between the FMLA request and the termination was just a coincidence.").

In addition to temporal proximity, Plaintiff claims that United Services showed "resentment" toward her use of medical leave. Specifically, she points to the events of October 25, 2018, when her supervisor, Odgren, required her to document an absence from work as vacation rather than sick leave. *Id.* She argues that this incident evinces "a hostility toward [her] request

for sick leave" that, a jury might reasonably conclude, could indicate a more general hostility toward Plaintiff's request under the FMLA. *Id.*

Plaintiff also points to two facts that she says demonstrate that United Services' real reason for terminating her employment was not her purported violation of HIPAA and related laws and policies. First, while she was fired in November 2018, the emails in question were generated months earlier, "in July and September of 2018[,]" and she claims a jury could conclude that the reason they were not flagged earlier was because they did not, in fact, violate United Services' policies. *Id.* at 8, 9 (arguing that Plaintiff had a good-faith belief that her emails were compliant, and that her disclosure satisfied the imminent-danger exceptions described above). Second, she argues that Defendant's account of the investigation—about her coworkers' interpersonal complaints prompting a review of her emails—strains credibility. *Id.* at 9.

These arguments are unavailing. Plaintiff has presented no direct evidence that her firing was motivated by her exercise of rights under the FMLA, and the indirect evidence she points to is insufficient to raise a genuine issue of material fact. "[A]t step three, unlike at the prima facie stage, [a plaintiff] cannot rely on the inferences of timing alone." *Fu v. Consol. Edison Co. of N.Y., Inc.*, 855 Fed. App'x 787, 791 (2d Cir. 2021) (citing *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 847 (2d Cir. 2013) ("Temporal proximity alone is insufficient to defeat summary judgment at the pretext stage.")); *see also El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) (per curiam) (affirming summary judgment for employer where employee was terminated three weeks after his protected activity but the record contained no other evidence of pretext). The temporal proximity here is very close—only fourteen days separated Plaintiff's FMLA request from her termination—but even in such cases of "very close temporal proximity[,]" a plaintiff must point to some additional evidence to raise an issue of fact with respect to pretext.

*See, e.g.*, *Zann Kwan*, 737 F.2d at 847 (pointing to employer's "inconsistent explanations for her termination").

Other than temporal proximity, Plaintiff's strongest piece of evidence in support of pretext is the October 25 incident, in which she departed work early and was told to use vacation, rather than sick leave, to account for her absence. But this single incident fails to accomplish the weighty task Plaintiff ascribes to it, even when seen in the light most favorable to her.

On that date, Plaintiff departed the crisis desk shortly after arriving to repair her personal cell phone. Def.'s Rule 56(a) ¶ 29. When she returned, she told her supervisor, Odgren, that she was feeling unwell and would need to leave for the rest of the day. Def.'s Rule 56(a) ¶ 30. Odgren allowed Plaintiff to leave early but told her that she would need to document the absence as vacation time, not sick time. *Id.* ¶ 31. Plaintiff recorded her absence as sick time. *Id.* ¶ 32. Six days later, when Odgren emailed Plaintiff asking her to document the absence as vacation, Plaintiff responded by saying, "I was sick Lisa and my stomach was not okay before I got to work. I am taking sick time[,]" followed minutes later by a second email: "Lisa, I have lupus and I woke up that morning with a headache from the medication I am taking. I came in anyway but the stress of my phone made it worse. I rarely take any sick time, but my stomach was upset and the headache was worse and that is when I asked to leave and use sick time. I don't think you want to push me on this." *Id.* ¶¶ 33–34.

Given the dispute of fact over when Plaintiff first told Odgren that she has lupus, *see supra*, n.2 (citing Pl.'s Rule 56(a) ¶ 35), the Court assumes for purposes of summary judgment that Plaintiff informed Odgren of this fact on October 25 when she said she wanted to leave work early. Even so, Odgren's insistence that Plaintiff document her absence as a vacation day, amounting as it does to a dispute between Plaintiff and her direct supervisor over a single, dis-

crete use of leave—made before Plaintiff's request for intermittent FLMA leave and with no apparent nexus to the decision by United Services' CEO to terminate Plaintiff's employment—does not give rise to an inference that United Services was hostile towards requests for FMLA leave, much less that this purported hostility motivated its decisions in Plaintiff's case.

Plaintiff's attempts to minimize the seriousness of the privacy violations are also unconvincing. Plaintiff's subjective belief that she was not in violation of United Services' policies or federal or state law does not excuse her actions. She alleges that United Services' failure to discipline her before November for actions that occurred from June to September proves that she was actually compliant with United Services' policies, but this argument does not pass muster, for several reasons. First, the delay was a short one. Second, United Services' could not have discovered her communications—which she failed to document, in violation of company policy—absent investigation. And third, Plaintiff presents no substantive explanation beyond the good-faith defense to explain how her conduct complied with the policy, and her good-faith defense is unsupported by the text of United Services' policies or the applicable statutes. As this Court has held before, "Plaintiff's rationalizations for conduct prohibited by her employer are immaterial." *Percoco v. Lowe's Home Centers, LLC*, 208 F. Supp. 3d 437, 444 (D. Conn. 2016) (citing *McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997)). Even if Plaintiff subjectively believed that she was compliant with governing policy and law, violations of HIPAA and other federal and state laws "put [United Services] at risk" because they "could jeopardize United Services' programs, funding, and ability to serve patients in need of mental health and substance abuse services." Def.'s Exh. A ¶¶ 12, 53.

Furthermore, no jury could reasonably conclude that United Services' investigation into Plaintiff's conduct was a pretext to retaliate against her for exercising her FMLA rights. United

Services recounts that it conducted an investigation after receiving two detailed and lengthy complaints by Plaintiff's coworkers concerning, in large part, her communications with them and with supervisors. Plaintiff makes no allegation that her coworkers were somehow induced by United Services' management to make their complaints, and presents no evidence that could support such a theory. To the contrary, both complaints refer to recent events that provided the impetus for their writing. Def.'s Exh. J at 4–5 (anonymous letter) ("Her recent behaviors have been alarming and should be brought to your attention[;]" "This is said because of the last client she sent to the ED in October[;]" "The day Ellen had an issue with her personal cell phone [October 25] is a day heard throughout the agency."); *id.* at 2–3 (email from Jayme Boling) (referring to a recent team meeting during which Plaintiff became "aggressive and irritable" and saying, "I have not spoken to Ellen since Friday.").[10] Boling specifically states that she twice shared her concerns with the Division Director, who "informed [her] of the process to make a formal complaint" but "in no way coerced, influenced, directed, or encouraged" her to do so. *Id.* at 2. Instead, Boling wrote that she made the complaint because, "[d]ue to the constant aggression and hostility toward me, I no longer feel I can manage this situation on my own." *Id.* at 3. For her part, Plaintiff presents no evidence from which one might reasonably conclude that these complaints were anything other than authentic expressions of concern regarding her behavior.

---

[10] The anonymous complaint contains the only comment in the record that one could argue disparages Plaintiff's health condition. Its author claims that Plaintiff often argues with her husband on the phone while at work and "becomes extremely emotional, either yelling or crying," and continues, "She then tries to justify her emotional outburst as being caused by her 'Lupus'." Def.'s Exh. J at 4. However, there is no evidence that this reference to Plaintiff's lupus was made by anyone involved in the decision to terminate Plaintiff's employment, or that it influenced their decision to do so. The only hint as to the anonymous letter's origin is in a handwritten note appended to the typed letter: "Sent in by DG 11/5/18[.]" The initials "DG" do not correspond to any of Plaintiff's supervisors or other decisionmakers at United Services, such as CEO Diane Manning, division director Sara Barber, or supervisor Lisa Odgren, though they do correspond to an individual, Diana Giordano, named in the Complaint as one of several individuals who attended a team meeting with Plaintiff on November 2, 2018. *See* Doc. 1 ¶ 23.

Lending further strength to Defendant's position is Plaintiff's mixed performance record at United Services. In June 2017, Plaintiff was placed on an "improvement plan" to remedy perceived issues with her attitudes toward and communications with co-workers and supervisors. Def.'s Rule 56(a) ¶ 41. After receiving a positive performance review in July 2018—which described Plaintiff's improvements in "accept[ing] constructive feedback" and a plan to avoid "breakdowns in communication[,]" Pl.'s Exh. 2 at 1—Plaintiff received an off-cycle "reassessment" from her division director, Sara Barber, on October 4, weeks before the October 25 sick-leave incident and Plaintiff's November 2 request for intermittent FMLA leave. Def.'s Exh. I at 2. In the reassessment, Barber noted similar concerns to those in the June 2017 improvement plan, including "struggl[ing] to accept feedback and take direction[,]" "poor judgment[,]" and unprofessional and inappropriate language. *Id.* at 2–3. These issues dovetail with those raised in her coworkers' complaints, indicating a pattern of behavior that gave United Services good cause to investigate further.

That investigation, concerning as it did the propriety of Plaintiff's communications, included a review of Plaintiff's emails. Manning explained, by affidavit, how shortly after beginning an investigation of the complaints, she reviewed Plaintiff's emails and discovered a recent email entitled "concerns[.]" Def.'s Exh. A ¶ 28; Def.'s Exh. M at 3. This subject line bore a marked resemblance to the second complaint, entitled "Formal Concern[,]" which had launched her investigation. Ex. J at 2. The account of the United Services' CEO—that she opened the email believing that it might be relevant to the coworkers' complaints, and not because she was on a fishing expedition for an excuse to terminate Plaintiff—is the only version of events supported by the record. *See* Def.'s Exh. A ¶ 28.

This case differs greatly from those FMLA retaliation suits in which the Second Circuit has found a sufficient factual showing to survive summary judgment. In *Graziadio*, for instance, the Court of Appeals reversed a district court's grant of summary judgment in favor of an employer, concluding that temporal proximity and "[t]he weakness of the evidence supporting the defendant's explanation" for the termination could "permit the conclusion" that defendants' explanation was mere pretext. 817 F.3d at 431. The Court of Appeals noted substantial "additional circumstantial evidence supporting a finding of pretext[:]" the plaintiff showed that her employer suspended her access to the computer network in August 2012—"well before" the purported reason for her termination, the following month, had transpired—and also "presented testimony of an employee in the Human Resources department who said that, in his opinion, [the employer] intended to replace Graziadio as early as July, since, at that time, he was asked to compose a job description for 'a temporary employee . . . and "most likely" for a permanent replacement for Graziadio.'" *Id.* Finally, the Court of Appeals pointed to evidence of the employer's pattern of FMLA retaliation, in the form of deposition testimony by the same Human Resources employee, testimony by another former employee who was threatened with disciplinary action in a similar situation, and a New York state "Compliance Action Report" concerning that incident. *Id.* n.10.

Here, Ms. Waltman can point to no such actions by United Services to terminate her employment prior to its discovery of her emails containing A.J.'s protected health and substance abuse information. Nor does she identify other employees who were terminated after seeking FMLA leave, or employees who violated United Services' privacy policies without consequence.

These facts also differ from those in *Grewcock*, in which this Court denied summary judgment. 293 F. Supp. 3d at 277, 280–81. In *Grewcock*, the Court concluded that testimony by the plaintiff and her colleague, as well as two job descriptions, supported her claim that the ac-

tion for which she was purportedly terminated—viewing the patient chart of a supervisor's relative for fewer than twenty seconds—was actually within the scope of her job duties. *Id.*[11] Judge Meyer wrote, "Plaintiff has substantial arguments that what she did was within the scope of her job responsibilities and that the investigation of her access to the patient's chart arose in circumstances of discriminatory hostility against her." *Id.* at 281. Unlike the plaintiff in *Grewcock*, Ms. Waltman has presented no evidence—no testimony of coworkers, no job descriptions—upon which a jury could reasonably find that sharing A.J.'s information with outside parties was within her job description.

Additionally, in *Grewcock*, it was the same manager "who had been at the center of the conflict over plaintiff's requested lactation [the basis for her discrimination claim] who requested the audit of the patient's chart that in turn led to the investigation that she spearheaded" and who "was also, at least in part, responsible for the termination decision." *Id.* at 281. Here, there is no evidence of overlap between the individuals involved in Plaintiff's request for FMLA leave and those involved in her investigation and termination. Odgren, who supervised Plaintiff and issued her a warning regarding her leave on October 25, 2018, was a recipient of one of the complaints sent by Plaintiff's colleagues on November 6, 2018, but it appears that another recipient, Barber, forwarded that complaint to United Services' CEO, Manning, and there is no evidence that Od-

---

[11] In *Grewcock*, the plaintiff justified her actions as follows: "According to plaintiff, the purpose of her review of this particular patient's chart was to ascertain the patient's bed needs, *i.e.*, where the patient may need to be transferred. This patient's chart was one of a number of charts plaintiff reviewed that evening. Although the department to which this patient was to be transferred had its own bed managers, clinical bed managers in plaintiff's department routinely reviewed such records." *Id.* at 277 (citations to the record omitted). Grewcock's job description gave her "responsib[ility] for oversight of *all* patient admissions, discharges and transfer activity while monitoring capacity both currently and prospectively[,]" and her colleague supported her account in a sworn statement: "The access to that patient's file in this case was completely normal and necessary for [plaintiff] to perform her job. She was engaged in the usual triaging . . . ." *Id.* at 281.

gren was involved in Manning's investigation of Plaintiff and ultimate decision to terminate her. *See* Def. Exh. A ¶¶ 23–43; Def. Exh. J at 2.

For these reasons, I conclude that no finder of fact could reasonably conclude that the legitimate, nondiscriminatory reason for Plaintiff's termination was pretextual, and as a result, her claim of FMLA retaliation must be dismissed at summary judgment.

## B. Interference Claim

In an interference claim, brought distinctly from a retaliation claim, a plaintiff alleges that an employer interfered with his or her rights under the FMLA. To succeed on an interference claim, a plaintiff must establish: 1) that he or she is an eligible employee under the FMLA; 2) that the defendant is an employer as defined by the FMLA; 3) that the plaintiff was entitled to take leave under the FMLA; 4) that the plaintiff gave notice to the defendant of his or her intention to take leave; and 5) that the plaintiff was denied benefits to which he or she was entitled under the FMLA. *See, e.g., Graziadio*, 817 F.3d at 424; *Coutard v. Mun. Credit Union*, 848 F.3d 102, 108 (2d Cir. 2017) (quoting five *Graziadio* elements and noting that "our Court has 'formally adopt[ed]' this 'standard regularly used by district courts of this Circuit'— . . . [for a plaintiff] to prevail on an interference claim") (quoting *Graziadio*, 817 F.3d at 424). The Second Circuit has held that a terminated employee fails to prove interference where he or she did not show that the employer "considered [the protected activity] a negative factor in its decision to terminate [him or her].'" *Sista v. CDX Ixis N. Am., Inc.*, 445 F.3d 161, 176 (2d Cir. 2006).

Plaintiff argues that, although Defendant approved her request for intermittent FMLA leave, Defendant "effectively denied . . . her rights under the FMLA by terminating her one day after [she took] her first FMLA designated absence from work." Doc. 1 ¶ 42. Defendant, citing authority, argues that "termination of employment does not constitute denial of benefits, particu-

35

larly where, as here, the plaintiff was terminated for undisputed misconduct." Doc. 19 at 19 (citing *Sista*, 445 F.3d at 176, and *Hewett*, 171 F. Supp. 3d at 18). Plaintiff has made no attempt, either in objecting to summary judgment or in her accompanying memorandum of law, to refute Defendant's position. *See generally* Docs. 26, 26-1. Nonetheless, the Court will briefly discuss the merits of Defendant's argument.

As explained in *Hewett*, "terminat[ion] for legitimate business reasons . . . negates [an] interference claim." 171 F. Supp. 3d at 18 (citing *Sista*, 445 F.3d at 176, and *Pearson v. Unification Theological Seminary*, 785 F. Supp. 2d 141, 162 (S.D.N.Y. 2011). The Southern District of New York recounted, in *Pearson*, that

> it is well-settled that an employer is not liable for "interfering" with an employee's leave when the employee would have been terminated regardless of the leave. *See* [*Sista*, 445 F.3d at 175–77]; *see also* 29 C.F.R. [§] 825.216(a) ("An employee has no greater right to reinstatement . . . than if the employee had been continuously employed during the FMLA leave period."); *Throneberry v. McGehee Desha County Hosp.*, 403 F.3d 972, 979 (8th Cir. 2005) ("As long as an employer can show a lawful reason, i.e., a reason unrelated to an employee's exercise of FMLA rights, for not restoring an employee on FMLA leave to her position, the employer will be justified to interfere with an employee's FMLA leave rights."); *Geromanos v. Columbia Univ.*, 322 F.Supp.2d 420, 429 (S.D.N.Y. 2004) ("FMLA is not a shield to protect employees [from] legitimate disciplinary action by their employers if their performance is lacking in some manner unrelated to their FMLA leave.").

785 F. Supp. 2d at 162. This rule is the result of common sense; it cannot be the case that an employer, having approved an employee's request for FMLA leave, becomes categorically precluded from terminating that employee even for valid reasons without giving rise to an interference claim.

For the same reasons that Defendant has shown it had a legitimate, nondiscriminatory reason for terminating Plaintiff, namely, her sharing of A.J.'s protected health and substance abuse information in violation of law and United Services' policies, it also has demonstrated that

it terminated her for a legitimate business reason. There can be no genuine dispute of material fact as to this conclusion, and so summary judgment must be granted to Defendant on Plaintiff's claim of FMLA interference.

## IV. CONCLUSION

Upon review of the present record, the Court concludes that no reasonable jury could find Plaintiff's rights under the FMLA to have been violated in connection with United Services' decision to terminate her employment. Defendant's motion for summary judgment, Doc. 18, is therefore GRANTED. Plaintiff's Complaint is DISMISSED WITH PREJUDICE.

The Clerk of the Court is directed to close the file.

It is **SO ORDERED**.

Dated: October 6, 2022
New Haven, Connecticut

_/s/ Charles S. Haight, Jr._
CHARLES S. HAIGHT, JR.
Senior United States District Judge